IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| JONNY MAE OLIVER, ) | CIVIL ACTION NO. 9:08-0886-MBS-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein she was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

Plaintiff filed an application for Supplemental Security Income (SSI) on August 12, 2005, alleging disability due to symptoms associated with HIV disease. (R.pp. 23-24, 70-77, 86-92).[1] Plaintiff's claim was denied initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on April 30, 2007. (R.pp. 309-324). The ALJ thereafter denied Plaintiff's claim in a decision issued October 12, 2007. (R.pp. 7-22). The

---

[1] The definition of disability is the same under both SSI and DIB (Disability Insurance Benefits). Emberlin v. Astrue, No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008). Under SSI, however, the claimant's entitlement to benefits (assuming they establish disability) begins the month following the date of filing the application forward. Pariseau v. Astrue, No. 07-268, 2008 WL 2414851, * 13 (D.R.I. Jun. 13, 2008).



Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 2-5).

The Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for an award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that the Plaintiff was properly found not to be disabled.

### Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)). The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).



**Discussion**

A review of the record shows that Plaintiff, who was forty-two (42) years old when she submitted her application for SSI, has a high school equivalency education with past relevant work experience as a housekeeper and fast food clerk. (R. pp. 23-24, 81-85, 312-313). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that she has an impairment or combination of impairments which prevent her from engaging in all substantial gainful activity for which she is qualified by her age, education, experience and functional capacity, and which has lasted or could reasonably be expected to last for at least twelve (12) consecutive months.

After review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff suffers from the severe impairments[2] of HIV, Bell's palsy, and depression, thereby rendering her unable to perform her past relevant work, she nevertheless retained the residual functional capacity (RFC) to perform a restricted range of sedentary work[3], and was therefore not entitled to SSI. (R. pp. 12, 15, 21). Plaintiff asserts that in reaching this decision, the ALJ erred by improperly evaluating the opinion of physician's assistant Cameron [Burch] Oswald, by finding that there are jobs that exist in the national economy that Plaintiff can perform notwithstanding her impairments, and by not properly considering the combined effects of Plaintiff's severe and non-

---

[2]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a) ["An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities"]; Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987).

[3]Sedentary work is defined as lifting no more than 10 pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a) (2005).



severe impairments on her ability to sustain gainful employment.

After careful review and consideration of the arguments and evidence presented, the undersigned finds that there is substantial evidence in the record to support the conclusion of the ALJ with respect to Plaintiff's RFC. However, the undersigned also concludes that it was error for the ALJ to rely on the Medical-Vocational Guidelines (i.e., the Grids") to direct a finding of not disabled, and that a remand is therefore required in order to obtain vocational expert (VE) testimony.

**I.**

With respect to Plaintiff's RFC, the medical record reveals that Plaintiff presented herself to the Medical University of South Carolina on August 5, 2005 for the purpose of establishing herself in MUSC's HIV clinic. Plaintiff was apparently homeless at that time with a history of being a prostitute, and advised that she had been HIV positive since 1998. She apparently had contracted HIV through prostitution, although it also may have been as a result of intravenous drug use. Plaintiff also had a history of several sexually transmitted diseases. Plaintiff was seen by physician's assistant Cameron Burch, who noted that Plaintiff had only been hospitalized previously on one occasion, in September 2003 for a hysterectomy. She advised PA Burch that she used crack cocaine, and had been smoking crack for ten or fifteen years. She also drank approximately nine wine coolers a week.

As for her physical condition, Plaintiff reported that her appetite was good, that she was gaining weight, that her energy was good, and she denied any fatigue. She had no history of asthma or pneumonia and no history of chest pain during exertion or at other times during the day. Plaintiff also denied any muscle or joint problems, anxiety or memory loss, and, although she did admit to a "depressed mood", she had never been on any antidepressants. A physical examination revealed that Plaintiff had 5/5 upper and lower extremity strength with no joint edema, a regular heart

4



rate, and no breathing problems. Plaintiff's complaints of shortness of breath were attributed to acid reflux. A chest x-ray was normal. Plaintiff was diagnosed with HIV disease, shortness or breath, Hepatitis C positive, depression, and history of syphilis. (R.pp. 254-257, 265).

On September 9, 2005, Plaintiff was diagnosed with acute dyspnea and pneumonia following a hospital visit with complaints of shortness of breath. (R.pp. 260-263, 279-285). Plaintiff thereafter returned to PA Burch for a follow up visit on September 23, 2005, at which time she advised PA Burch that she had had a touch of "pneumonia". She discussed the medication she had received and advised that she had no further symptoms at that time. Plaintiff further advised that she was "feeling well", and that she also no longer felt a need for any kind of treatment or counseling for depression. Plaintiff did admit that she had used crack cocaine within the last three weeks, but declined any help for drug abuse. Plaintiff was diagnosed with HIV disease, Hepatitis C, hypertension, and status post pneumonia. Her depression was considered "resolved for the time being". (R.pp. 251-253).

On November 17, 2005, Plaintiff had a chest x-ray performed at the Summerville Medical Center, which was negative, and a head CT scan, which was also essentially negative, although it did reflect an old traumatic finding. (R.pp. 228-229). The following day, Plaintiff presented to the Trident Health System Office in Summerville, South Carolina with complaints that her mouth was twisted to the left and that her left arm was numb. Plaintiff reported that she typically drank a twelve pack of beer on the weekend and that she had a history of cocaine abuse. Plaintiff was examined by Dr. Anthony Joseph, who found Plaintiff to be in no acute distress, alert and oriented, with slurred speech, and right facial weakness. A cardiovascular examination was normal, Plaintiff's extremities had normal range of motion with no deformity and no edema, and sensation was "pretty much symmetrical throughout." However, Plaintiff was unable to frown or lift her right eyebrow,



5

although she had normal sensation on the right side of her face. Plaintiff also reported the sensation of tingling in her left arm. On strength examination, Plaintiff had 5/5 bilateral hand grip and 5/5 upper extremity strength, as well as 5/5 strength bilaterally in her lower extremities. Dr. Joseph believed there was a "high suspicion for Bell's palsy", and prescribed Acyclovir and Prednisone. He also restarted Plaintiff on some anti-hypertensive medications for her hypertension. Dr. Joseph noted Plaintiff's history of HIV and that she was being followed at MUSC, although she was not currently on HAART therapy.[4]  (R.pp. 222-224, 236).

Plaintiff was also seen at Trident Health by Dr. Thomas Privett, a neurologist, who noted that a CT brain scan showed no acute findings, that Plaintiff's chest x-ray was negative, and that a carotid ultrasound showed no flow limiting stenosis. Plaintiff advised Dr. Privett that she smoked half a pack of cigarettes a day[5], that she only occasionally used alcohol, and denied use of illicit drugs. Upon examination, Dr. Privett found no evidence of right facial weakness, that Plaintiff's sensation was intact, and advised that her condition was "consistent with a Bell's phenomenon." He diagnosed Bell's palsy, recommended Plaintiff wear an eye patch and use Lacri-Lube as needed at night to protect her eye, and advised her to continue taking Prednisone and Acyclovir. (R.pp. 226-227). See also R.pp. 230-235.

Plaintiff remained at Trident Health System until November 20, 2005, when she had

---

[4]Highly active antiretroviral therapy (HAART) is the combination of several antiretroviral medicines used to slow the rate at which HIV makes copies of itself (multiplies) in the body. The use of three or more antiretroviral medicines-sometimes referred to as an anti-HIV "cocktail"-is currently the standard treatment for HIV infection. The goal of antiretroviral therapy is to reduce the amount of virus in your body (viral load) to a level that can no longer be detected with current blood tests. http://www.webmd.com/hiv-aids/tc/human-immunodeficiency-virus-hiv-infection-treatment

[5]Plaintiff had previously told Dr. Joseph that she smoked three cigarettes a day. (R.p. 222)



a discharge summary completed by Dr. Rick Olson. On discharge, Plaintiff was found to be stable and tolerating her medications well. Her hydrochlorothiazide intake was increased to help her control her blood pressure. Plaintiff was also to be seen by "Dr. Birch" in one to two weeks with a consideration to restart her previous HIV medications at that time. (R.pp. 219-220).

Plaintiff thereafter returned to MUSC on December 2, 2005 for followup of her HIV disease. Physical examination at that time was unremarkable. PA Burch noted that Plaintiff's last CD4 of 483 and viral load of 11,088 copies in August did not meet the criteria for initiation of therapy, but that she was going to order new lab tests to see where Plaintiff's CD4 and viral loads were presently. Plaintiff's Bell's palsy was found to be "getting better", and it was noted that Plaintiff had never begun her prescription of Acyclovir. (R.pp. 248-250). At a followup on January 6, 2006, Plaintiff advised PA Burch that she was doing well, although she had been feeling more fatigued since her last visit, that her blood pressure was better on Lisinopril, and that her Bell's palsy had almost entirely resolved. Review of Plaintiff's systems was otherwise unremarkable and she had no other complaints, while the tests from December 2, 2005 revealed a CD4 count of 387 and a viral load of 9840 copies, which still did not meet the criteria for therapy. Plaintiff was continued with her medications and was to be seen back in seven weeks, with new labs to be drawn in five weeks. (R.pp. 245-247).

State agency physician Dr. Jean Smolka reviewed Plaintiff's medical record on May 1, 2006 and completed a Residual Functional Capacity Assessment in which she found that Plaintiff could perform light work[6] that did not require the climbing of ladders/ropes, scaffolds or more than

---

[6]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2005).



7

the occasional climbing of ramps/stairs, stooping, kneeling, crouching, and crawling, or more than balancing. (R.pp. 207-214).

Plaintiff returned to see PA Burch on May 12, 2006, at which time her physical examination was again unremarkable. It was noted that tests conducted on February 10, 2006 showed a CD4 count of 376, while her viral load was nondetectable April 14, 2006. With respect to her HIV disease, PA Burch stated that Plaintiff was "doing excellent on Combivir and Sustiva with a fully suppressed viral load". Plaintiff's blood pressure was also controlled. Plaintiff did not believe that Zoloft, which PA Burch had given her on her last visit for depression, was helping, so that was discontinued and Plaintiff was started with Prozac. Plaintiff's only other complaint was left arm pain and numbness and tingling extending from the left elbow to her fingertips, which bothered her mainly at night. (R.pp. 155-157).

State Agency psychologist Dr. Mark Williams reviewed Plaintiff's medical records on May 23, 2006, and completed a Psychiatric Review Technique Form in which he found that Plaintiff had no medically determinable impairment. (R.pp. 193-206).

Plaintiff was back to see PA Burch (now Cameron Burch Oswald) on June 30, 2006 for a followup, at which time it was noted that she had earlier been seen in an emergency room for a urinary tract infection, now resolved. Physical examination was again unremarkable. It was noted that Plaintiff had been taking Elavil at night for her shoulder and left arm problems, which had "helped". Plaintiff reported that she could not tell whether Prozac was helping with her depression, stating that she had "good days and bad days", and opining that she would continue to be depressed "as long as I am . . . living in my car". With respect to Plaintiff's HIV, PA Oswald reported that "[Plaintiff's] CD4 count climb and viral load remains fully suppressed on a regimen of Combivir and Sustiva." PA Oswald opined that the Elavil seemed to be addressing Plaintiff's upper extremity



peripheral neuropathy symptoms, and noted that she was going to increase Plaintiff's Prozac prescription to "help with her mood". (R.pp. 158-160).

The record reflects that Plaintiff took an overdose of her medications on July 2, 2006 and was taken to the emergency room. Plaintiff reported being depressed, angry and frustrated, and this episode was identified by the emergency physician on duty as being a suicide attempt. A physical examination at that time was unremarkable, with no assessed abnormalities. (R.pp. 128-130, 133-134, 139-140). Plaintiff was evaluated by psychologist Dr. Dera Corder, to whom Plaintiff denied suicidal or homicidal ideation. Plaintiff also declined treatment for both her emotional problems and her "crack use".[7] Dr. Corder found Plaintiff's memory to be fair, her use of language clear and coherent, her thoughts to be "organized" with no hallucinations, with a mood congruent to the situation. Plaintiff was also found to be "somewhat hostile" and angry, with complaints that she just wanted to "go home". Dr. Corder assessed Plaintiff with no suicidal thoughts or of harming others, and she was not considered violent. Plaintiff was diagnosed with depression, not otherwise specified, as well as with crack cocaine dependence, and was discharged. (R.pp. 141-151).

Plaintiff returned to see PA Oswald for a followup on September 22, 2006, at which time she reported that she remained depressed but otherwise had been feeling fine physically. While Plaintiff continued to complain of left upper extremity mononeuropathy, mainly related to sleep position, she stated that she no longer wished to take Elavil because she felt like it was not really working. She also wanted to get off Sustiva because she believed it gave her nightmares. Physical examination was unremarkable. Per Plaintiff's request, she was switched from Sustiva to Kaletra for her HIV disease. Elavil and Prozac were also discontinued. It was also noted that Plaintiff's

---

[7]Plaintiff reported that she had overdosed after "smoking a lot of crack". (R.p. 141).



hypertension was apparently uncontrolled at that time because she had run out of hydrochlorothiazide, but she was scheduled to pick up another prescription that afternoon. (R.pp. 161-163).

On September 28, 2006, Plaintiff went to MUSC to be interviewed by Sue Ellen Hawkins, a social worker, upon referral from PA Oswald. Plaintiff told Hawkins that she did not understand why she had been referred, denied any depression, and reported that she had not used crack cocaine in at least two months, and no alcohol in two weeks. Plaintiff stated that she did not want to take any more medication, and described her appetite as good. Hawkins notes reflect that Plaintiff's energy was good, and that her affect was bright. Plaintiff agreed to come back in three weeks. (R.p. 168). When Plaintiff returned on October 19, 2006, she told Hawkins that she continued to have days of "feeling blue and depressed." She again denied crack cocaine use for approximately two months. Plaintiff was ready to try an antidepressant, however, and Wellbutrin was prescribed after consultation with PA Oswald. (R.p. 170). At another followup appointment on November 2, 2006, Plaintiff reported that she thought Wellbutrin was helping her to drink less. She also again denied crack cocaine usage, and was hopeful to be approved for disability and then find a place to live. (R.p. 171).

On November 8, 2006, PA Oswald completed a medical assessment form in which she opined that Plaintiff would have marked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace, and that she would also experience drowsiness as a side effect of a medication [illegible]. PA Oswald further opined that Plaintiff would frequently experience symptoms which would interfere with the attention and concentration needed to perform even simple work tasks during a typical work day, that she would be unable to perform routine, repetitive tasks at a consistent pace, detailed or complicated tasks, or fast paced tasks due to



workplace stress, that she could sit and stand no more than forty-five minutes at one time, and walk and stand no more than forty-five minutes at one time, following which she would need to sit. Plaintiff was also able to sit, stand and walk less than two hours in an eight hour work day. PA Oswald believed Plaintiff would have to rest up to ten minutes before returning to work at least four times during an average workday, and that she only had the lifting capacity for sedentary work. (R.pp. 176-181).

Plaintiff returned to see PA Oswald on November 10, 2006, at which time it was noted that Wellbutrin was helping Plaintiff's depression "somewhat". Plaintiff's only complaint was some chest discomfort related to heartburn, with no shortness of breath, numbness or tingling in her left upper extremity, or diaphoresis associated with this pain. Physical examination on that date was again unremarkable, although Plaintiff's hypertension was uncontrolled, possibly attributed to her taking NyQuil, which she was instructed to immediately stop taking. Plaintiff's last CD4 count was noted to have been 599 on October 27, 2006, while her last viral load was undetectable on October 27, 2006. (R.pp. 164-166). Plaintiff also continued to see social worker Sue Ellen Hawkins and reported on January 11, 2007 that she had been doing "fairly well", and was waiting to hear regarding her Social Security application. Plaintiff denied any further relapses with crack cocaine since the one she reported in "November", and reported that she was trying to quit smoking. Her appetite and mood were both good. (R.p. 174).

After review of this medical record and evidence together with the subjective testimony from the hearing, the ALJ determined that Plaintiff had the severe impairments of Bell's palsy, depression, and positive HIV, but that she nevertheless retained the residual functional capacity to perform unskilled sedentary work activity with occasional overhead lifting with the non-dominate left arm and no concentrated exposure to lung irritants. (R.pp. 12, 15). As part of this finding, the



ALJ specifically found with respect to Plaintiff's mental impairment, that Plaintiff had only mild restrictions in her activities of daily living; mild to moderate difficulties in social functioning; mild to moderate difficulties with regard to concentration, persistence or pace; and no episodes of decompensation. (R.p. 14). There is ample substantial evidence in the record to support these findings.

With regard to Plaintiff's complaint that the ALJ improperly evaluated the opinion of PA Oswald concerning the degree of Plaintiff's impairment, a review of the decision shows that the ALJ discussed Oswald's opinion, but found that the records from MUSC failed to reveal any reason for Oswald's "extreme assessment." Cf. Burch v. Apfel, 9 Fed.Appx. 255 (4th Cir. 2001) [ALJ did not err in giving little weight to opinion that was inconsistent with medical provider's own progress notes]; Sultan v. Barnhart, 369 F.3d 857, 863 (8th Cir. 2004)[Treating source's opinion found not to be persuasive based, in part, on the opinion being unsupported by own treatment notes]. In rejecting the extent of limitations found by Oswald, the ALJ also discussed the other medical evidence showing that Plaintiff did not have any problems with attention and concentration, that she had routinely been found to be alert and oriented and able to handle her own affairs, and that there was no documentation in the record to support a finding that Plaintiff would need to take four unscheduled breaks to rest during an eight hour work day or that she had an inability to sit for less than two hours in an eight hour day. See generally (R.pp. 19-21); Melton v. Apfel, 181 F.3d 939, 942 (8th Cir. 1999)[lack of medically necessary restrictions supports ALJ's non-disability findings].

The ALJ also noted the opinions of the medical consultants, who had reviewed the evidence and found that Plaintiff could perform a restricted range of light work activity (physical RFC), and that she had no determinable mental impairment. (R.pp. 193-214); see Smith v. Schwieker, 795 F.2d 343, 345 (4th Cir. 1986) [opinion of non-examining physician can constitute



substantial evidence to support the decision of the Commissioner]; Johnson v. Barnhart, 434 F.3d 650, 657 (4th Cir. 2005) [ALJ can give great weight to opinion of medical expert who has thoroughly reviewed the record]; see also SSR 96-6p [Agency physicians are experts in the evaluation of medical issues for purposes of disability claims].

The ALJ specifically noted that by restricting Plaintiff to a limited range of sedentary work along with finding Plaintiff did have mild to moderate limitations as part of a mental impairment, he had given Plaintiff the "absolute benefit of the doubt" by granting Plaintiff even more severe restrictions than were opined to by the medical consultants. The undersigned cannot find a reversible error in these findings. While Plaintiff argues that the ALJ did not give proper consideration to Oswald's opinion, the ALJ in his decision specifically notes that Oswald is considered an acceptable medical source under current regulations and that her opinion had been "carefully considered". Hence, it is clear that the ALJ did evaluate PA Oswald's opinion, as he was required to do. However, he was not required to accept this opinion, nor was PA Oswald's opinion entitled to the same weight as those of physicians. See Craig v. Chater, 76 F.3d 585, 589-590 (4th Cir. 1996)[Stating importance of treating physician's opinions, and noting that opinions of those other than trained medical doctors are not afforded the same weight as opinions of physicians]. The ALJ's consideration and evaluation of the medical evidence in making his decision was a proper exercise of his authority. Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; Clarke v. Bowen, 843 F.2d 271, 272-273 (8th Cir. 1988)["The substantial evidence standard presupposes . . . a zone of choice within which the decision makers can go either way without interference by the Courts"]; cf. Ross v. Shalala, No. 94-2935, 1995 WL 76861, at * 2 (Feb. 24, 1995)[ALJ's decision upheld where the ALJ appeared to split the difference between physicians' opinions].



Finally, Plaintiff's argument that the decision should be reversed because the ALJ failed to adequately consider the effects of Plaintiff's limitations in combination is without merit. A review of the ALJ's decision shows that he thoroughly discussed all of the medical evidence as well as Plaintiff's subjective testimony in making his decision, including the claimed impairments that the ALJ ultimately determined were not severe because they no more than minimally affected Plaintiff's ability to perform work related activity. (R.pp. 12-21). Hays, 907 F.2d at 1456 [it is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; see Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964) [court scrutinizes the record as a whole to determine whether the conclusions reached are rational]. The decision also details the ALJ's analysis of how these impairments affect Plaintiff's residual functional capacity, including the "combination" of Plaintiff's impairments. (R.p. 13). Mickles v. Shalala, 29 F.3d 918, 925-926 (4th Cir. 1994) [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence]; cf. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) [ALJ properly considered whether claimant's impairments in combination were disabling by separately discussing claimant's impairments].

While Plaintiff obviously disagrees with the ALJ's conclusions, the record contains substantial evidence to support his findings. Dryer v. Barnhart, 395 F.3d 1206, 1211( 11th Cir. 2005) [ALJ not required to specifically refer to every piece of evidence in the decision]; Jolley v. Weinberger, 537 F.2d 1179, 1181 (4th Cir. 1976) [finding that objective medical evidence, as opposed to the claimant's subjective complaints, supported an inference that he was not disabled]; Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) , 993 F.2d at 35 [ALJ may properly consider inconsistencies between a plaintiffs testimony and the other evidence of record in evaluating the credibility of the plaintiffs subjective complaints]; see also Cruse v. Bowen, 867 F.2d 1183, 1186 (8th



Cir. 1989) ["The mere fact that working may cause pain or discomfort does not mandate a finding of disability"]; Gross v. Heckler, 785 F.2d 1166 (4th Cir. 1986)["[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss."]; Foster v. Bowen, 853 F.2d 483, 489 (6th Cir. 1988) [A mental impairment diagnosis is insufficient, standing alone, to establish entitlement to benefits.]. Therefore, Plaintiff's objections to the ALJ's findings with respect to her RFC are without merit.

## II.

As noted, Plaintiff also argues that the ALJ committed reversible error by using the Medical-Vocational Guidelines (i.e., the "Grids") to direct a finding that she is not disabled. The undersigned agrees with this argument.

Because the ALJ determined that Plaintiff is unable to perform her past relevant work, the burden shifted to the Commissioner to show that other jobs exist in significant numbers which Plaintiff could perform. Pass v. Chater, 65 F.3d 1200, 1201-1203 (4th Cir. 1995). In appropriate circumstances, the ALJ can meet this burden by using the "Grids" to direct a finding that a claimant is not disabled. See Hays, 907 F.2d at 1458 [affirming denial of benefits to claimant where the Medical-Vocational Guidelines directed a finding of not disabled]. However, the Grids do not apply to a claimant who suffers from severe non-exertional impairments, or who cannot perform the full range of work activity within a Grid category. Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989); see 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(h).

Here, the ALJ found that Plaintiff's depression was a severe impairment, resulting in mild restrictions in her activities of daily living; mild to moderate difficulties in social functioning; mild to moderate difficulties with regard to concentration, persistence or pace; and no episodes of decompensation. (R.p. 14). The ALJ states in his opinion that he accounted for these limitations by



15

limiting Plaintiff to unskilled work. (R.p. 19). The ALJ then further found that these limitations had little or no effect on the occupational base of unskilled sedentary work, and that a finding of "not disabled" based on the Medical-Vocational guidelines was therefore appropriate. (R.p. 21). This finding constitutes reversible error.

According to the findings of the ALJ in this case, Plaintiff's depression is a severe non-exertional impairment. The Grids do not apply to a claimant who suffers from severe non-exertional impairments. Walker, 889 F.2d at 49. While it is true that the Grids may still be used to direct a finding of not disabled where non-exertional impairments, even severe, do not significantly reduce a claimant's occupational base; see Ortiz v. Secretary of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989) ["If a non-strength impairment, even though considered significant, has the effect only of reducing [the] occupational base marginally, the Grid remains highly relevant and can be relied on exclusively to yield a finding as to disability."]; see also Gentry v. Secretary, No. 85-5751, 1986 WL 17763 at **1-2 (6th Cir. 1986) [In a case where the impairments included migraine headaches, the court held that "[n]on-exertional limitations preclude use of the grid only when the limitations are severe enough to prevent a wide range of gainful employment at the designated level."]; cf. Guyton v. Apfel, 20 F.Supp.2d 156, 163 (D.Mass. 1998)[discussing reliance on Grids where non-exertional limitations were found to not significantly effect claimant's ability to engage in substantial gainful activity]; Egleston v. Bowen, 851 F.2d 1244, 1247 (10th Cir. 1988) [presence of non-exertional limitations does not preclude use of the Grids if non-exertional limitations do not further limit the claimant's ability to perform work]; that was not the finding of the ALJ in this case. Rather, he found that Plaintiff's depression has resulted in mild to *moderate* difficulties in social functioning, as well as mild to *moderate* difficulties with regard to concentration, persistence or pace. Moderate difficulties in maintaining social functioning or in maintaining concentration, persistence



or pace would obviously affect the occupational base for unskilled sedentary work, precluding reliance on the Grids to direct a finding of not disabled. Cf. Bonds v. Astrue, No. 07-1135, 2008 WL 2952446, at * 11-12 (D.S.C. July 29, 2008)[Whether Plaintiff's moderate impairment in the area of concentration, persistence and pace eroded the occupational base and to what degree it was eroded was a determination for a vocational expert]; Chapa v. Astrue, No. 05-253, 2008 WL 952947, at * 6 (N.D.T. Apr. 8 2008)[Case reversed where ALJ applied Grids to direct a finding of not disabled, instead of obtaining vocational expert testimony, where claimant had moderate impairment in the area of concentration, persistence and pace]; Millhouse v. Astrue, No. 08-378, 2009 WL 763740, at * 4 (M.D.F. Mar. 23, 2009)[Use of Grids to direct a find of not disabled improper where ALJ has found that Plaintiff has a severe impairment of depression, which means that it significantly affects the Plaintiff's ability to work].

      While it may be that a vocational expert will be able to identify unskilled sedentary jobs which Plaintiff could perform with her limitations, it was nevertheless improper for the ALJ to use the Grids to direct a finding of not disabled after he had found that she had mild to moderate limitations in social functioning and with regard to concentration, persistence or pace. Bonds, 2008 WL 2952446, at * 11. Therefore, remand is required so that a vocational expert can be called to address this issue in response to a proper hypothetical which includes all the Plaintiff's impairments. Fenton v. Apfel, 149 F.3d 907, 910 (8th Cir. 1998) ["The Secretary is required to produce vocational expert testimony concerning availability of jobs which a person with a claimant's particular characteristics can perform, if...he or she is precluded from performing a full range of a particular work classification...."].



17

**Conclusion**

Based on the foregoing, and pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner with remand in Social Security actions under Sentence Four of 42 U.S.C. § 405(g), it is recommended that the decision of the Commissioner be **reversed**, and that this case be **remanded** to the Commissioner for the purpose of obtaining vocational expert testimony to establish whether the Plaintiff can perform other work with her exertional and non-exertional limitations.  See  Shalala v. Schaefer, 113 S.Ct. 2625 (1993).

_____
Bristow Marchant
United States Magistrate Judge

June 1, 2009

Charleston, South Carolina

